IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-00868-PAB-CBS

MARIA GALLARDO and
D.R.G., a minor child by and through
her natural mother and next best friend, MARIA GALLARDO,

    Plaintiffs,

v.

UNITED STATES OF AMERICA,

    Defendant.

_____

**ORDER**
_____

This case arises out of an injury suffered by D.R.G. during her birth. Plaintiffs contend that the obstetrician who delivered D.R.G. provided medical care falling below the applicable standard of care. This case is being tried to the Court. This matter is before the Court on defendant United States of America's motions to exclude the testimony of Stephen Glass, M.D. [Docket Nos. 156, 166] and Michael G. Ross, M.D. [Docket Nos. 158, 165] pursuant to Fed. R. Evid. 702.

**I. FEDERAL RULE OF EVIDENCE 702**

Pursuant to Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts

of the case.

Fed. R. Evid. 702 (2011). As the rule makes clear, while required, it is not sufficient, that an expert be qualified based upon knowledge, skill, experience, training, or education to give opinions in a particular subject area. Rather, the Court must "perform[] a two-step analysis." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). After "determin[ing] whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion," *id.* (quoting Fed. R. Evid. 702), the specific proffered opinions must be assessed for reliability. *See id.*; Fed. R. Evid. 702 (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").

Rule 702 "imposes on the district court a gatekeeper function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). To execute that function, the Court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93). When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant

scientific community." *103 Investors I*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

While a plaintiff, as the proponent of the challenged testimony, has the burden of establishing admissibility, the proffer is tested against the standard of reliability, not correctness, *see Allstate Sweeping, LLC v. City and County of Denver*, No. 10-cv-00290-WJM-MJW, 2011 WL 2173997, at *3 (D. Colo. June 2, 2011) (noting that the "proponent of the opinion need not prove that the expert is indisputably correct"); a plaintiff need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008).

## II. DISCUSSION

### A. Dr. Glass

Plaintiffs seek to have Dr. Glass testify (1) that "D.R.G. suffered a hypoxic ischemic injury during her birth due to the too frequent contracts [sic] (hyperstimulation) and too intense uterine tone (hypertonus)" and (2) that a defense expert's "life expectancy methodology is flawed and speculative." Docket No. 94 at 16. The United

States seeks to have both opinions excluded.

### *1. Obstetrical Opinions*

The United States contends that Dr. Glass' opinions regarding the cause of D.R.G.'s injuries "are within the purview of an obstetrician, not a child neurologist." Docket No. 166 at 5. Pursuant to Rule 702, reliance on a witness' qualifications is no longer sufficient foundation to admit expert testimony, *Crabbe*, 556 F. Supp. 2d at 1220,[1] but it is a threshold requirement which, if not met, requires exclusion of expert opinions. Dr. Glass must "stay[] within the reasonable confines of his subject area." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quotation marks and citation omitted); *see Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1093 (W.D. Okla. 2009) ("[T]he expert's qualifications must be both (i) adequate in a general, qualitative sense ( i.e., 'knowledge, skill, experience, training or education' as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert."). "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston*, 275 F.3d at 970; *cf. In re Cessna 208 Series Aircraft Products Liability Litigation*, 2009 WL 3756980, at *13 (D. Kan. Nov. 9, 2009) ("Where alleged expertise with regard to other aspects of a field gives a proffered expert no special insight into the issues of the case,

---

[1]As discussed above, even if a witness is qualified to provide expert testimony, the proponent of the witness still has the burden of showing that the expert's testimony is reliable and admissible. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001); Fed. R. Evid. 702, Advisory Committee Notes to the 2000 Amendments ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

such alleged expertise does not qualify the witness as an expert.").

Dr. Glass is a child neurologist. His practice includes "evaluat[ing] . . . children that have disorders of development" and "children with epilepsy." Docket No. 166-1 (Glass Depo.) at 5, ll. 2-3, 9. He also treats a "variety of commonly seen problems in a general child neurology practice from traumatic brain injury to metabolic disorders, degenerative diseases, and a wide range of neuromuscular diseases." Id. at 5, ll. 13-17. Dr. Glass' practice also includes "reviewing cases for attorneys, most of which are medical malpractice, most of which . . . are related to baby issues." Id. at 6, ll. 5-7. Dr. Glass' past experience includes "doing newborn consults, consults for kids admitted with traumatic brain injury for neurosurgery service, post-cardiac surgery babies, [intensive care] kids, [emergency room] kids." Id. at 5, l. 24 - 6, l. 3. He is not, however, a neonatologist but does "do fetal neurology consults" and will "see newborns . . . after they [have] been discharged from the hospital." Id. at 8, ll. 16-17, 21-23; see id. at 9, ll. 6-7 ("[W]hen it relates to a neonatal neurologic problem, I claim expertise."). Dr. Glass' obstetrical experience is limited to "learning from talking to obstetrics colleagues and reading in obstetrics on obstetric topics that have neurologic relevance." Docket No. 166-1 at 9, ll. 19-21.

Plaintiffs fail to explain how much of the substance of Dr. Glass' report, which Dr. Glass admits is obstetrical in nature, is within the "reasonable confines" of Dr. Glass' expertise. Dr. Glass does not contend that it is. Rather, he relies upon the opinions of others, stating that the records and reports of other doctors supply the foundation of his opinion. Dr. Glass' causation opinion, however, is that "D.R.G. suffered a hypoxic

5

ischemic injury during her birth due to the too frequent contracts [sic] (hyperstimulation) and too intense uterine tone (hypertonus)." A review of Dr. Glass' report, *see* Docket No. 166-2, reveals that this opinion, and his bases for it, consists primarily of recounting other doctors' interpretations as reported in D.R.G.'s medical records. *See, e.g.*, Docket No. 166-2 at 3 ("Given her active irritability and increased tone and reflexes, a diagnosis of probable hypoxic-ischemic encephalopathy was provided."); *id.* ("Findings were felt to be consistent with severe hypoxic-ischemic injury."). Dr. Glass concedes that this is the case. *See* Docket No. 166-1 at 16, ll. 7-12 (describing the range of specialties that treat a newborn with a neurological issue and how they "all provide care or attention or analysis of a case" and "it's not as though we are all functioning in parallel with no derivative opinions based upon other people's thoughts" and Dr. Glass "incorporate[s] those [thoughts] into [his] opinions but [doesn't] offer them as [his] own opinions."); *see also* Docket No. 166-1 at 27, ll. 17-18 ("I'm using the clinical record as it exists as my source of data.").

      Although Dr. Glass does then proceed to offer his explanation for why he believes the medical records support his conclusion, that explanation also appears to largely recount, without significant independent analysis, what was noted in the underlying medical records. For example, Dr. Glass' causation opinion turns on interpretation of fetal monitoring data. Dr. Glass, however, testified that he has "no firsthand training in fetal monitor interpretation and do[es] not hold [him]self out to be an expert." Docket No. 166-2 at 10, ll. 3-5; *see id.* at 11, ll. 1-3 (testifying that he could not "offer [him]self as having to look at [fetal monitoring] strips and making an independent

judgment as to its findings"); *cf. Icon Health & Fitness, Inc. v. Nautilus Group, Inc.*, 2005 WL 6015496, at *3 (D. Utah Aug. 29, 2005) ("In *Ralston*, a board certified orthopaedic surgeon's expert testimony regarding the performance of a particular procedure was excluded where the proposed expert had never performed the procedure at issue, never researched the procedure, and admitted that she 'knew little – if anything – about the subject.") (citing *Ralston*, 275 F .3d at 969). Although Dr. Glass is permitted to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed" so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," Fed. R. Evid. 703, he is not permitted to merely relay expert opinions of others. *See Raley v. Hyundai Motor Co.*, 2010 WL 199976, at *6 (W.D. Okla. Jan. 14, 2010) ("Where he brings no additional or other expertise to bear on the issue, there is no basis for him simply repeating the conclusions of others as his own.") (citing *TK–7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993)).[2] In sum, plaintiffs have not met their burden of showing that Dr. Glass is qualified to offer opinions regarding obstetrical matters.

---

[2]*See TK-7 Corp.*, 993 F.2d at 732 (citations and footnote omitted):
Hearsay is normally not permitted into evidence because the absence of an opportunity to cross-examine the source of the hearsay information renders it unreliable. Rule 703 permits experts to rely on hearsay, though, because the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." That rationale is certainly not satisfied in this case, where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction. Dr. Boswell's lack of familiarity with the methods and the reasons underlying Werber's projections virtually precluded any assessment of the validity of the projections through cross-examination of Dr. Boswell.

Therefore, the Court will not permit him to offer such opinions. *Cf. Ralston*, 275 F.3d at 969 ("Because we find that Dr. Templeton's testimony was properly excluded on the ground that she was unqualified, we have no need to address the reliability of her conclusions under *Daubert*.").

With that said, plaintiffs also retained Dr. Glass to opine on the nature of D.R.G.'s resulting neurological injuries. *See* Docket No. 166-1 at 29, ll. 4-5. The United States does not challenge Dr. Glass' ability to offer an expert opinion regarding the nature of those injuries based on his own reading of MRI and CT scans.[3] In regard to those scans, Dr. Glass testified as follows:

> [T]he initially acute MRI scan and later follow-up scans all document findings consistent with impaired cerebral blood flow and radiographic findings consistent with partial prolonged asphyxia. This has now led to irreversible injury to [D.R.G.'s] central nervous system, evident not only radiographically but also, more importantly, physically. [D.R.G.] now presents with a small head size (microcephaly) due to failure of brain growth but, moreover, spastic quadriplegic cerebral palsy and global developmental delay. [D.R.G.] has and will suffer a lifelong neurologic syndrome with likely dependence on others for all aspects of her care.

Docket No. 166-2 at 9. On the present record, there appears no reason why Dr. Glass may not offer this opinion. Although he may not offer opinions regarding his interpretation of what occurred during labor, Dr. Glass may be able to offer his opinion regarding the consistency between the descriptions by obstetricians who testify at trial regarding what occurred during labor and the neurological results Dr. Glass identified in the scans. *Cf. Siegel v. Fisher & Paykel Appliances Holdings Ltd.*, 2010 WL 4174629,

---

[3]Dr. Glass testified that he relied on the opinions found in the medical records with the exception of a March 20, 2007 CT scan and a September 25, 2007 MRI scan. *See* Docket No. 166-1 at 30, ll. 6-15.

at *2 (W.D. Ky. Oct. 19, 2010) ("He may not adopt another expert's opinions wholesale . . ., but may testify about his investigation, data and evidence gathered, and his own opinions that are supported by more than speculation ( e.g., that the cause and origin of the fire was internal to the range").[4] The Court will leave that determination until he testifies.

### 2. Life Expectancy Opinions

Pursuant to Fed. R. Civ. P. 26(a), a party seeking to call an expert witness must provide the opposing party with a written report, prepared and signed by the expert, that outlines the opinions; the facts and data considered; the expert witness' qualifications; and the compensation to be paid to the expert witness for his work and testimony in the case. Fed. R. Civ. P. 26(a)(2)(B)(i)-(vi). Rule 26 thus "imposes a . . . duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." Fed. R. Civ. P. 26(a)(2), Adv. Comm. Note (1993). The United States correctly points out that Dr. Glass did not include any reference to life expectancy methodology in his expert report and was not

---

[4] *In re Genetically Modified Rice Litigation*, 2010 WL 5070718, at *6 (E.D. Mo. Dec. 6, 2010) ("While [experts] may not testify on matters outside of their expertise or beyond the scope of their reports, they may apply the results of another expert's calculations, if a foundation is laid showing that they are qualified to do so. For instance, a rice-growing expert may testify about the reasonableness of Bayer's growing practices, even though he may not testify about market damages. An accountant may apply the results of an economist's market damages calculations to a particular farm, but the accountant may not give an opinion on the accuracy of the economist's calculations. Experts may also critique the methodology of other experts, provided that they do so in their role as an expert based on a reliable method of analysis.") (citations omitted).

identified by plaintiffs as an expert they intended to call on that subject, thus violating Fed. R. Civ. P. 26(a)(2).

As a general rule, when a party fails to comply with Rule 26(a)'s disclosure requirements, that party "is not allowed to introduce the expert witness's testimony. . . at a trial." *Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 641 (7th Cir. 2008) (quoting Fed. R. Civ. P. 37(c)(1)); *see also Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 894-95 (10th Cir. 2006). Nevertheless, Federal Rule of Civil Procedure 37(c) permits courts to admit expert testimony, despite a party's failure to comply with Rule 26(a), as long as the violation is "justified or harmless." Fed. R. Civ. P. 37(c)(1). In determining whether the failure to comply with Rule 26(a) is justified or harmless, courts weigh four factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1176 (10th Cir. 2011) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002)). Plaintiffs have not argued that the testimony should be allowed pursuant to Fed. R. Civ. P. 37(c)(1) and do not respond to any of the government's arguments regarding the inadmissibility of Dr. Glass' life expectancy opinion under Rule 702.

Instead, plaintiffs contend that the opinion is admissible because defendant "opened the door" to the testimony by asking Dr. Glass about life expectancy during his deposition. Plaintiffs cite no authority for the proposition that, by exploring a topic in a deposition, defendant concedes to the admissibility of the answer pursuant to Rule 702. Nor have plaintiffs explained how any such concession would somehow be sufficient to

meet their burden of establishing the admissibility of the answer in any event. Therefore, the Court will preclude Dr. Glass' life expectancy opinions.

### B. Dr. Ross

Plaintiffs seek to have Michael G. Ross, M.D., testify regarding the timing of D.R.G.'s injuries. Dr. Ross estimates the timing of injury based on a retrograde extrapolation of D.R.G.'s base excess in the time preceding delivery. The United States does not challenge Dr. Ross's qualifications in obstetrics and maternal fetal medicine, but argues that his timing opinion is based on an unreliable methodology relying upon assumptions which lack sufficient factual support. *See, e.g.*, Docket No. 165 at 5 ("He assumes that a linear relationship exists over time between the onset of asphyxia and the increase in base deficit. . . . However, this assumption is not supported by scientific evidence."). The United States also appears to challenge the relationship between the data relied upon and the nature of the opinions offered. *See* Docket No. 165 at 5 (arguing that Dr. Ross assumes that "newborns with severe metabolic acidosis at the time of birth are more likely than not going to have neurological impairment" despite his "own testimony that only a minority of babies (10-40%) will suffer cognitive deficits with base deficits greater than 12").

Because this case will be tried to the Court, "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise." *Atty. Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009). "[A] judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation." *Id.* at 780; *see Whitehouse Hotel Ltd. Partnership*

*v. Comm'r of Internal Revenue*, 615 F.3d 321, 330 (5th Cir. 2010) ("[T]he importance of the trial court's gatekeeper role is significantly diminished in bench trials . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence."); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 613 (8th Cir. 2011) ("[T]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.") (quotation marks, citation, and alteration omitted). The Court concludes that the United States' challenges to Dr. Ross's opinions are best left until the presentation of the evidence at trial. At that time, the United States can fully explore the bases for the opinions through cross-examination and, depending on the state of the testimony, renew its request that Dr. Ross's testimony be excluded under Rule 702 or that the Court only consider it to a limited degree.[5]

## III. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant United States of America's motion to exclude the testimony of Stephen Glass, M.D. [Docket Nos. 156, 166] pursuant to Fed. R. Evid. 702 is GRANTED in part and DENIED without prejudice in part. It is further

**ORDERED** that defendant United States of America's motion to exclude the testimony of Michael G. Ross, M.D. [Docket Nos. 158, 165] pursuant to Fed. R. Evid.

---

[5]For example, the United States contends that, "[e]ven if [Dr. Ross's] estimate of base excess were inaccurate for any given point in time, metabolic acidosis in and of itself is not predictive of neurologic injury . . . ." Docket No. 171 at 1-2. The United States does not argue, however, that metabolic acidosis is not at all correlative with neurological injury. The weight and extent of Dr. Ross's opinion on this issue can be assessed and developed through trial without risk of misleading a jury.

702 is DENIED without prejudice.

DATED April 10, 2012.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge